**Hrg. Date:  March 23, 2006, 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
J. Gregory Milmoe (JGM 0919)
Sally McDonald Henry (SMH 0839)

  - and -

300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
(213) 687-5000
Douglas B. Adler (DBA 6013)
Richard Levin
Attorneys for Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| REFCO INC., et al., | : | Case No. 05-60006 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| REFCO CAPITAL MARKETS, LTD., | : | |
| REFCO F/X ASSOCIATES, LLC, | : | |
| | : | Adv. Proc. No. 05-03224 (RDD) |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| ACM ADVANCED CURRENCY | : | |
| MARKETS S.A., LLOYD LA MARCA, | : | |
| ALEXANDER AXARLIS, BENOÎT | : | |
| SAUVAIN, AND NICHOLAS BANG, | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**Debtors' Opposition to Motion of
Defendants to Dismiss Complaint**

# Table of Contents

**Page**

Preliminary Statement ................................................................................................ 1

Argument .................................................................................................................... 3

I.     The Complaint States a Legally Sufficient Claim ............................................ 3

     A.     The Court Must Accept the Complaint's Allegations as True and Construe Them in Debtors' Favor ..................................................................... 3

     B.     The Court Should Not Revisit Whether the Allegations of the Complaint State a Claim for Violation of the Automatic Stay ................................. 4

     C.     Defendants Violated the Automatic Stay by Attempting to Divest Debtors of their Control of ACM and to Exercise Debtors' Preemptive Rights ................. 5

          (1)     Case Law Demonstrates that Defendants Violated the Automatic Stay ........................................................................................ 5

          (2)     Defendants Rely on Inapposite Case Law ................................. 10

II.     This Court Has Personal Jurisdiction over the Individual Defendants ............................ 12

     A.     The Court Must Accept the Complaint's Allegations as True and Those Allegations Need Only Make a Prima Facie Showing of Personal Jurisdiction ...................................................................................... 12

     B.     The Individual Defendants Have Sufficient Minimum Contacts with the United States Because Their Actions in Switzerland Had an Effect Here in the United States and Because They Acted in New York .................................. 13

III.     If the Court Determines that the Complaint Fails to Allege Facts Showing Minimum Contacts, the Court Should Hold the Action in Abeyance as to the Individual Defendants or, Alternatively, Permit Jurisdictional Discovery ...................... 16

Conclusion .................................................................................................................. 18

# Table of Authorities

**Cases**

In re 48th Street Steakhouse Inc., 835 F.2d 427, 431 (2d Cir. 1987)....................................... 6

In re Alstom SA Securities Litigation,
   No. 03Civ.6595(VM), 2005 U.S. Dist. LEXIS 35642
   (S.D.N.Y. December 22, 2005) ............................................................................................ 15

In re AstroPower Liquidating Trust,
   35 B.R. 309 (Bankr. D. Del. 2005).................................................................................. 14, 16

Colonial Realty Co. v. River Bank America (In re Colonial Realty Co.),
   122 B.R. 1 (Bankr. D. Conn. 1990).......................................................................................... 6

Contractors' State License Board v. Dunbar (In re Dunbar),
   245 F.3d 1058 (9th Cir. 2001)................................................................................................ 13

In re Country Estates Nursing Homes, Inc.,
   268 B.R. 316 (Bankr. D. Mass 2001)....................................................................................... 6

Cruisephone, Inc. v. Cruise Ships Catering & Services. N.V.
   (In re Cruisephone, Inc.),
   278 B.R. 325 (Bankr. E.D.N.Y. 2002) .................................................................................. 15

Edisto Resources Corp. v. McConkey (In re Edisto Resources Corp.),
   158 B.R. 954 (Bankr. D. Del. 1993)................................................................................... 6, 7

Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litigation),
   765 F.2d 343 (2d Cir. 1985)................................................................................................... 13

Gear, Inc. v. L.A. Gear California, Inc.,
   637 F. Supp. 1323 (S.D.N.Y. 1986) ...................................................................................... 17

GMAM Investment Funds Trust I v. Globo Comunicacoes e Participacoes S.A. (In re Globo
   Comunicacoes e Participacoes S.A.), 317 B.R. 235, 252 (S.D.N.Y. 2004) .................................. 14

Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.,
   988 F.2d 476 (3d Cir. 1993).................................................................................................. 16

Hertz Corp. v. City of New York,
   1 F.3d 121 (2d Cir. 1993)......................................................................................................... 3

Hughes v. Rowe,
   449 U.S. 5, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980) ...................................................... 3

Kontrabecki v. Oliner,
   318 B.R. 175 (N.D. Cal. 2004)........................................................................................ 6, 7-8

Leasco Data Processing Equipment Corp. v. Maxwell,
   468 F.2d 1326 (2d Cir. 1972)................................................................................................ 15

In re Leydet,
   No. 91-25434-T, 1994 WL 282507 (Bankr. E.D. Va. Mar. 2, 1994)............................................. 6

In re Loughnane,
   28 B.R. 940 (Bankr. D. Co. 1983)......................................................................................... 11

Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.,
   84 F.3d 560 (2d Cir. 1996).................................................................................................... 14

Official Committee of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines Inc.),
119 B.R. 430 (S.D.N.Y. 1990) .................................................................................. 5

In re PCH Associates,
949 F.2d 585 (2d Cir. 1991) ..................................................................................... 4

Padavan v. United States,
82 F.3d 23 (2d Cir. 1996) ......................................................................................... 3

Park West Real Estate Corp. v. Calvert (In re Calvert),
135 B.R. 398 (Bankr. S.D. Cal. 1992) ............................................................... 10-11

In re Peoples Bankshares, Ltd.,
68 B.R. 536 (Bankr. N.D. Iowa 1986) ............................................................... 11-12

In re Schack Glass Industries Co., Inc.,
20 B.R. 967 (Bankr. S.D.N.Y. 1982) ..................................................................... 14

Tex. International Magnetics, Inc. v. Auriga-Aurex, Inc. (In re Magnetic Audiotape Antitrust
Litigation),
334 F.3d 204 (2d Cir. 2003) .............................................................................. 12, 14

Udall v. Wimberly,
118 N.M. 627, 884 P.2d 518 (1994) ....................................................................... 11

Venture Properties, Inc. v. Norwood Group, Inc. (In re Venture Properties, Inc.),
37 B.R. 175 (Bankr. D.N.H. 1984) ......................................................................... 11

Visual Sciences, Inc. v. Integrated Communications Inc.,
660 F.2d 56 (2d Cir. 1981) .............................................................................. 13, 17

Weight Watchers International v. Luigino's, Inc.,
423 F.3d 137 (2d Cir. 2005) ..................................................................................... 4

In re Winer,
158 B.R. 736 (N.D. Ill. 1993) ................................................................................. 11

**Statutes and Rules**

11 U.S.C. § 362(a) ........................................................................................................ 5

11 U.S.C. § 362(a)(1) .................................................................................................... 7

11 U.S.C. § 362(a)(3) ........................................................................................... 5, 6, 7, 9

28 U.S.C. § 1334(e)(1) ................................................................................................ 13

Federal Rule of Civil Procedure 12(b)(2) ............................................................... 12, 17

Federal Rule of Bankruptcy Procedure 7004(f) ............................................................ 14

**Legislative History**

H.R. Rep. No. 95-595, at 445 (1977), reprinted in A Collier on Bankruptcy app. pt. 4(d)(i), at
4-1605 (Alan R. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2005) ..................... 14

Plaintiffs Refco Capital Markets, Ltd. ("RCM"), and Refco F/X Associates, LLC ("RFX") (collectively, the "Debtors"), as debtors and debtors in possession, by and through their undersigned attorneys, submit this opposition to the *Motion of Defendants to Dismiss Complaint* (Docket No. 21) (the "Motion").

## Preliminary Statement

1.      As alleged in the Verified Complaint, after the Petition Date, and while three of the minority shareholders of ACM Advanced Currency Markets S.A. ("ACM") were negotiating with Debtors to purchase their controlling interest in ACM, the three minority shareholders caused ACM surreptitiously to attempt (a) to divest Debtors of their position as ACM's controlling shareholders and (b) to divert value from the estates' shares of ACM stock to the minority shareholders' new and existing shares.

2.      Defendants attempted this by causing ACM to convene an extraordinary general meeting of shareholders, without Debtors' knowledge.  At that meeting, ACM's minority shareholders purportedly authorized a capital increase of CHF 1'500'000 (1,500,000 Swiss francs[1]), by issuing 1,500 additional shares ("Additional Shares") at a par value of CHF 1'000 each.  About 30 minutes later, ACM declared that Debtors had failed to exercise their right to subscribe to their pro rata share of the 1,500 Additional Shares and, notwithstanding the automatic stay, transferred the estates' subscription rights to the minority shareholders.  Tellingly, the minority shareholders had four days earlier deposited funds with a Swiss bank sufficient to exercise their own subscription rights, as well as the subscription rights that would belong to these bankruptcy estates (but which, of course, could not be exercised until four days later).  Due

_____

[1]   One Swiss franc currently converts to about $0.76.

to ACM's failure to give Debtors direct or otherwise proper notice of the meeting, Debtors did not attend the shareholder meeting.

3. Four of the five named defendants (ACM, LaMarca, Axarlis, and Bang) move to dismiss the Complaint on the grounds that (1) their conduct did not violate the automatic stay, and thus the Complaint fails to state a claim, and (2) the Court lacks personal jurisdiction over the three non-corporate defendants (the "individual Defendants"), notwithstanding that they intended their conduct to have an effect here in the United States, i.e., on the property subject to this Court's exclusive jurisdiction.

4. The Court already determined that the Complaint states a claim, when in its ruling on Debtors' motion for a preliminary injunction the Court concluded that Defendants' conduct had violated the automatic stay.  That determination is law of the case and is binding precedent for this Motion.  As to personal jurisdiction, the individual Defendants submitted themselves to jurisdiction in the United States for two separate and independent reasons: (1) they acted in Switzerland intentionally and knowingly to affect US-based property by trying to divest these estates of the control position and preemptive rights arising from the estates' shares of ACM stock, and (2) they negotiated in the United States for the purchase of the estates' shares through New York counsel in furtherance of their plan to divest the estates of their rights. The Motion should therefore be denied.

2

**Argument**

## I.     The Complaint States a Legally Sufficient Claim

### A.     The Court Must Accept the Complaint's Allegations as True and Construe Them in Debtors' Favor

5.       It is fundamental that, in considering a motion to dismiss for failure to state a claim, the Court must accept as true all of the well-pleaded facts in the Complaint.[2]  This Court must accept as true that after the Petition Date,[3] three of ACM's minority shareholders, Defendants La Marca, Axarlis and Bang, delivered to Debtors in New York a letter dated October 24, 2005, expressing their interest in purchasing the Refco Shares from Debtors' bankruptcy estates.  Negotiations ensued in New York (between New York attorneys for both sides) concerning the sale and purchase of the Refco Shares, with the understanding that the sale would be subject to approval by this Court and the conduct of an auction in accordance with an order of this Court.  While negotiating this potential purchase, the minority shareholders caused ACM's board of directors to call an extraordinary meeting of shareholders.  Defendants, however, failed to give direct or otherwise proper notice of the shareholder meeting to Debtors, and Debtors did not learn of the meeting until after it had occurred.  (Compl. ¶¶ 18-20, at 7-8.)

6.       ACM's board convened a shareholder meeting on November 15, 2005, at 11:00 a.m.  The only shares represented at the meeting were the 732 shares held by the minority

---

[2]   A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Padavan v. United States, 82 F.3d 23, 26 (2d Cir. 1996) (quoting Hughes v. Rowe, 449 U.S. 5, 10, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980)).  A court must accept as true all well-pleaded facts and consider those facts in the light most favorable to the plaintiff. Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993).  The court's consideration "is limited to facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint by reference, as well as to matters of which judicial notice may be taken."  Id.

[3]   Unless defined otherwise in this Opposition, capitalized terms have the meanings given them in the Complaint.

3

shareholders.  The general meeting passed the following resolutions: (1) to increase the share

capital of ACM by CHF 1'500'000 by issuing at par 1,500 new shares with a par value of CHF

1'000 each; (2) to accept the resignation of Mr. Dante Canonica and to revoke Mr. Santo C.

Maggio (both appointed by Debtors) as members of the board of directors; and (3) to appoint

Mr. Bertrand Pariat as a new member of the board of directors.  The ACM board caused the

capital increase to be registered on November 18, 2005.  The foregoing actions occurred without

the knowledge or consent of Debtors.  Defendants acted to dilute Debtors' majority interest in

ACM with full knowledge of the pendency of Debtors' bankruptcy cases.  (Compl. ¶¶ 21-25, at

8-10.)

> **B.    The Court Should Not Revisit Whether the Allegations of the Complaint
> State a Claim for Violation of the Automatic Stay**

7.    The Court already considered whether the Complaint stated facts that

show an automatic stay violation when it recently entered a preliminary injunction.  Based on the

law of the case doctrine, the Court should not revisit that conclusion and, accordingly, should

deny that aspect of the Motion.  See In re PCH Assocs., 949 F.2d 585, 592 (2d Cir. 1991)

("Under the law of the case doctrine, a decision on an issue of law made at one stage of a case

becomes binding precedent to be followed in subsequent stages of the same litigation."); Weight

Watchers Int'l v. Luigino's, Inc., 423 F.3d 137, 143 (2d Cir. 2005) (noting that district court

determination made when granting preliminary injunction was law of the case).

8.    On January 31, 2006, this Court heard and ruled on Debtors' *Emergency

Motion for a Temporary Restraining Order and Preliminary Injunction* (Docket No. 3).  When

granting the preliminary injunction, the Court concluded that:

> [T]he debtor has laid out enough of a showing of likelihood of success on
> the merits to obtain injunctive relief, in that I believe that what's alleged
> here, is actions taken to deprive the debtor of a controlling interest without
> notice and in the face of ongoing or behind the scenes, notwithstanding the

4

ongoing negotiations to purchase the company, through the debtor's shares
in ACM, would be a violation of the stay under Section 362(a)(3) at least
for purposes of obtaining preliminary injunctive relief.

(Jan. 31, 2006 Tr. at 115:22-116:5.)  Similarly, the *Findings of Fact and Conclusions of Law in*

*Support of Preliminary Injunction* (Docket No. 23) ("Findings") provide:

> 3.  To the exten[t] that such showing is relevant, given Defendant
> ACM's violation of the automatic stay under 11 U.S.C. § 362(a), the
> Debtors will suffer irreparable injury if preliminary injunctive relief is not
> granted, in that, among other things, without immediate relief the Debtors
> may be unable to prevent or reverse the efforts of Defendants ACM, Lloyd
> La Marca, Alexander Axarlis, Nicholas Bang, and Benoît Sauvain to
> divest the Debtors of their position as controlling shareholders of ACM
> and Defendants' efforts to issue shares to ACM's minority shareholders
> and others at below-market prices, thereby reducing the value of Debtors'
> existing shares without any corresponding benefit; Defendants'
> misconduct would continue to disrupt Debtors' efforts to sell their shares
> in ACM under the supervision of this Court and would depress the price or
> value of those shares; and the Debtors would be subjected to substantial
> burden, expense and delay to remedy the Defendants' misconduct only
> through legal proceedings in Switzerland.
>
> > \* \* \*
>
> 8.  The events described in paragraph 3 constitute violations of the
> automatic stay for the purpose of obtaining preliminary injunctive relief.

(Findings ¶¶ 3, 8.)

> **C.    Defendants Violated the Automatic Stay by Attempting to Divest Debtors of
> their Control of ACM and to Exercise Debtors' Preemptive Rights**
>
> > **(1)    Case Law Demonstrates that Defendants Violated the Automatic Stay**

9.    Section 362(a)(3) of the Bankruptcy Code prohibits "any act to obtain

possession of property of the estate or of property from the estate or to exercise control over

property of the estate."  11 U.S.C. § 362(a)(3).   "The scope of protection afforded by the

automatic stay is broad . . . and it bars any action which 'would inevitably have an adverse

impact on the property of the bankruptcy estate.'"  Official Committee of Unsecured Creditors v.

PSS Steamship Co. (In re Prudential Lines Inc.), 119 B.R. 430, 432 (S.D.N.Y. 1990) (affirming

finding that parent corporation would violate automatic stay by taking worthless stock deduction in pre-confirmation years when it would eliminate subsidiary debtor's net operating loss carryback) (quoting In re 48th Street Steakhouse Inc., 835 F.2d 427, 431 (2d Cir. 1987)).

10.    The postpetition manipulation of a debtor's control over estate property or of the value of that property constitutes a violation of section 362(a)(3).  See, e.g., In re Country Estates Nursing Homes, Inc., 268 B.R. 316, 320 (Bankr. D. Mass. 2001) (holding that "exercise of the voting rights [by creditor to stock pledged to it by debtor] was . . . an act . . . to exercise control over the property of the estates" and violated automatic stay); Colonial Realty Co. v. River Bank Am. (In re Colonial Realty Co.), 122 B.R. 1, 4-5 (Bankr. D. Conn. 1990) (holding that lender's securing appointment of receiver over borrower's property contractually managed by debtor obtained possession of property from estates and thus violated automatic stay).

11.    Accordingly, courts have found stay violations where parties attempted to dilute or divert the value of stock owned by the estate or to diffuse the estate's holdings to transfer control rights.  See Edisto Resources Corp. v. McConkey (In re Edisto Resources Corp.), 158 B.R. 954, 956-58 (Bankr. D. Del. 1993) (finding stay violation where minority shareholders sought receivership to take over debtor-controlled subsidiary); Kontrabecki v. Oliner, 318 B.R. 175, 177 (N.D. Cal. 2004) (affirming denial of motion to dissolve stipulated preliminary injunction where shareholder had caused debtor's subsidiary to issue new shares that transferred control of subsidiaries); In re Leydet, No. 91-25434-T, 1994 WL 282507 (Bankr. E.D. Va. Mar. 2, 1994) (refusing to make contempt finding because individual debtor had complied with earlier order, which had enjoined him from taking any action to dilute value of estate's stock or diffuse estate's stockholdings in corporation).

6

12.    The <u>Edisto Resources</u> case is clearly on point.  There, the bankruptcy court held that the minority shareholders of a corporation, 80% owned by two debtors, violated section 362(a)(3) of the automatic stay when they requested the appointment of a receiver to take over the management of the corporation.  The court noted that the debtors' rights as 80% controlling shareholders under Texas law entitled them to elect the board of directors who managed the business and affairs of the corporation.  These rights constituted property of the estate and therefore the minority shareholders violated the stay by attempting to interfere with those rights through a receivership.

13.    Defendants claim that <u>Edisto Resources</u> is distinguishable because it involved a suit against a debtor and the section 363(a)(1) of the automatic stay barred that suit. (Mot. ¶ 34, at 15.)  The <u>Edisto Resources</u> suit, however, did not name any debtor.  There, the minority shareholders had filed their receivership action as a derivative action on behalf of the debtors' majority-owned corporation, as plaintiff,[4] against three of the debtors' officers. Although the officers were not themselves debtors and no debtor was named in the suit, the receivership suit still violated the automatic stay because it interfered with the debtors' control rights, i.e., property of the estate protected by section 362(a)(3).   158 B.R. at 956-57.

14.    Defendants also misconstrue <u>Kontrabecki v. Oliner</u>, 318 B.R. 175 (N.D. Cal. 2004).  They contend that the shareholder there violated the automatic stay because (1) he controlled the debtor and both of its subsidiaries when he caused the debtor to waive its preemptive rights, and (2) the share increase was a "sham."  The first point is a distinction

---

[4]   The corporation also "was named as a defendant in connection with a breach of employment claim by" one of the minority shareholders.  <u>Id.</u> at 956 n.1.  That claim was not relevant to the receivership/automatic stay issues.   <u>Id.</u>

without a difference, because the specific instrumentality by which the shareholder divested the
debtor of its controlling share rights was irrelevant.  Although Defendants here had no ability to
control Debtors to divest them of their rights to control ACM, Defendants still violated by stay
by using their New York negotiations and de facto control of ACM during the early chaotic days
of Refco's bankruptcy cases surreptitiously to divest Debtors of their control position,
subscription rights, and related share value.  As to the second point, <u>Kontrabecki</u> did not
determine that the share increase was a "sham" or indicate that such a determination was
necessary to find that the automatic stay violation had occurred.

   15. Here, Defendants' attempted capital increase improperly sought to exercise
control over estate property, namely Debtors' 51% majority interest and the rights and premium
that go with that interest.  That controlling interest brings a premium in any sale of the ACM
shares, places the estates in a stronger position with the individual Defendants in any revival of
the since-abandoned sale negotiations, and makes the estates' shares a more attractive asset to
potential competing bidders.

   16. In a further and separate harm to the estates, the value of Debtors' ACM
stock before the issuance of the Additional Shares was considerably higher than the value would
be if the issuance were completed.  The fair market value of the estates' controlling interest was
at least $55,000 per share (the amount offered to the estates by the individual Defendants, <u>see</u>
Mot. Ex. B at 6), but the minority shareholders paid only about $1,140[5] per share (the par value)
to purchase the Additional Shares they wish to obtain through the capital increase.  This loss of
value was the direct result of the individual Defendants' intentional efforts to obtain for

---

[5] One Swiss franc also converted to about $0.76 on November 15, 2005.

8

themselves the Additional Shares subject to Debtors' subscription rights, at below-market prices. They thus obtained possession and exercised control over property of the bankruptcy estates, causing a loss of value that the automatic stay of section 362(a)(3) was designed to prevent.

17.     Defendants nevertheless argue (from allegations not appearing in the Complaint) that the capital increase did not violate the automatic stay because the stay does not prohibit non-debtor businesses such as ACM from raising capital (Mot. ¶¶ 1, 15, at 2, 7), the capital increase was a normal corporate procedure for ACM to raise capital (Mot. ¶ 1, at 2), the capital increase "was not an attempt, in any way, shape or form, to obtain property of Refco" (Mot. ¶ 40, at 17), and Debtors could have participated but chose not to participate (Mot. ¶ 27, at 12).  The Complaint's allegations, however, tell a different story.  Defendants undertook the capital increase not to raise capital, but for the express purpose of divesting the estates of their control position (Compl. ¶ 19, at 7-8) after having decided that ACM "had to undertake action to separate as quickly as possible from" Debtors (Mot. Ex. B at 4).  After failing to give direct or otherwise proper notice of the shareholder meeting (Compl. ¶ 20, at 8), Defendants deposited funds sufficient to exercise Debtors' preemptive rights four days before Defendants could possibly know whether Debtors would exercise those rights (Compl. ¶ 23, at 9).  Afterward, Defendants announced the true purpose of the purported capital increase in a press release, asserting that the individual Defendants "managed to re-acquire the majority shareholding and therefore the controlling stake of their company."  (Compl. ¶ 27, at 10.)   By intentionally seeking to divest Debtors of their control position, Defendants indisputably attempted to exercise control over property of the estates in violation of the automatic stay.

18.     Defendants also argue that the capital increase had no effect on Debtors' control position because of contractual limitations on Debtors' ability to select the officers

constituting ACM's management team.  (Mot. ¶ 28, at 13.)  Defendants misconstrue the nature of

Debtors' control position.  The Stock Purchase Agreement ("SPA") by which Debtors made their

initial investment in ACM does provide that "management authority" remains with the minority

shareholders.  (Mot. Ex. A [SPA § 9.1, at 8].)  But the minority shareholders have no power to

transfer their management authority to anyone else, and thus Debtors retain control over whether

that management authority remains solely with the minority shareholders or (if the minority

shareholders give up the benefit of that provision) with Debtors.  Moreover, Debtors retain the

power to control the board of directors that supervises ACM's management team.  In addition,

Debtors appoint ACM's president.  (Mot. Ex. A [SPA § 5.2, at 6].)  The attempted capital

increase would divest Debtors of at least some of these protections.  For example, the power to

limit management authority to the minority shareholders exists only "so long as no change is

made to the shareholding of the Company . . . ."  (Mot. Ex. A [SPA § 9.1, at 8].)  Accordingly,

the attempted capital increase, if allowed to go forward, would adversely affect Debtors' control

position in violation of the automatic stay.[6]

### (2)    Defendants Rely on Inapposite Case Law

19.    Defendants rely heavily on <u>Park West Real Estate Corp. v. Calvert (In re

Calvert)</u>, 135 B.R. 398 (Bankr. S.D. Cal. 1992).  There, after a 50% shareholder filed a

chapter 11 petition, the non-debtor corporation held a special meeting of its board at which the

board authorized the issuance of additional shares to the other 50% shareholder, in exchange for

---

[6]   Defendants also assert that they were not trying to collect a debt (in violation of section 362(a)(6)), and that
Debtors make no such allegation. (Mot. ¶ 38, at 17.)  Their second press release, however, states that "it seems more
likely that [ACM has] a claim against Refco . . . ." (Compl. ¶ 29, at 12.)  And the Complaint does allege that
"Defendants . . . acted to take back control of ACM because of . . . their belief that ACM has a significant claim
against" Refco.  (Compl. ¶ 19, at 11.)

debt owed by the corporation to the shareholder.  Notwithstanding the resulting reduction in the

debtor's percentage ownership, the automatic stay did not prevent the exchange because a pre-

petition appointment of a provisional director under state law prevented any transfer of control

and no party asserted that the debt-for-equity transaction was below market.  Thus, unlike here,

in Park West there was no transfer of control of the corporation or any direct diversion of the

value of the debtor's shares to other shareholders.  Id. at 399, 402.

        20.    The other cases cited by Defendants are also inapposite.  All of these cases

involved actions directly affecting a non-debtor or the assets of a non-debtor, but not actions

affecting the debtor's ownership interest in a non-debtor.  See, e.g., Venture Props, Inc. v.

Norwood Group, Inc. (In re Venture Properties, Inc.), 37 B.R. 175 (Bankr. D.N.H. 1984)

(refusing to apply automatic stay to restrain sellers from disposing of property subject to

purchase agreement assigned to non-debtor partnership, even though debtor was general partner);

In re Loughnane, 28 B.R. 940 (Bankr. D. Colo. 1983) (concluding that automatic stay did not

prevent IRS from collecting unpaid taxes from non-debtor corporation 100% owned by debtor);

In re Winer, 158 B.R. 736, 743-48 (N.D. Ill. 1993) (finding no automatic stay violation because

debtor-director's personal power to wind-up non-debtor corporation was not a property interest);

Udall v. Wimberly, 118 N.M. 627, 884 P.2d 518 (1994) (individual defendant held in contempt

after failing to submit evidence that purging himself of contempt would require exercise of

control over property of debtor-corporation's estate).

        21.    For example, in In re Peoples Bankshares, Ltd., 68 B.R. 536 (Bankr. N.D.

Iowa 1986), the bankruptcy court recognized that the automatic stay protects a debtor's

"intangible personal property rights represented by stock certificates," which would include

control, subscription, preemptive, anti-dilution, and other similar rights arising from share

11

ownership.  But the court concluded that the automatic stay did not prevent regulatory action

against non-debtor bank subsidiaries or their assets, even though those actions might indirectly

affect the value of the debtor's stock in those subsidiaries.  Id. at 539.

      22.    Here, Defendants intended to affect directly Debtors' assets:  the estates'

block of shares in ACM and the intangible personal property rights represented by those

shares—control rights and preemptive rights to prevent the corporation from distributing new

shares at below-market prices to the detriment of other shareholders.  Defendants' efforts to

implement the capital increase, as alleged in the Complaint, therefore violated the automatic stay.

Accordingly, the Motion should be denied to the extent it seeks dismissal of the Complaint for

failure to state a claim upon which relief can be granted.

## II.    This Court Has Personal Jurisdiction over the Individual Defendants

      23.    The individual Defendants move to dismiss the Complaint under

Rule 12(b)(2) for lack of personal jurisdiction, by incorporating the jurisdictional argument made

in their *Opposition of Defendants to Requests by Refco for Request for Preliminary Injunction*

(Docket No. 18) (the "Injunction Opposition").   The Injunction Opposition asserted that this

Court lacks personal jurisdiction over the individual Defendants only because they did not have

the required "minimum contacts" with the United States.  (Inj. Opp'n at 7-9.)

### A.    The Court Must Accept the Complaint's Allegations as True and Those
###      Allegations Need Only Make a Prima Facie Showing of Personal Jurisdiction

      24.    Where, as here, a defendant has not submitted any evidence in support of a

motion to dismiss for lack of personal jurisdiction, the court must accept as true the allegations

of the complaint.  Tex. Int'l Magnetics, Inc. v. Auriga-Aurex, Inc. (In re Magnetic Audiotape

Antitrust Litig.), 334 F.3d 204, 206 (2d Cir. 2003).  And until conducting a complete evidentiary

hearing on the merits, Debtors need only allege facts sufficient to make a prima facie showing

that the Court has personal jurisdiction over the individual Defendants. See <u>Visual Sciences, Inc.</u>

<u>v. Integrated Commc'ns Inc.</u>, 660 F.2d 56, 58 (2d Cir. 1981).

     25.    In addition to Defendants' intentional conduct directed at the United States

as described above, the Complaint alleges that:

> This Court has personal jurisdiction over [the individual] Defendants . . .
> because each delivered to the Debtors in New York an expression of
> interest in buying the estates' ACM shares, retained counsel in New York,
> and negotiated in New York to purchase the estates' ACM shares,
> acknowledging that . . . any transaction would be subject to approval by
> this Court.

(Compl. ¶ 7, at 4.)

> Defendants acted to dilute Debtors' majority interest in ACM with full
> knowledge of the pendency of the Debtors' bankruptcy cases. . . .
> Defendants were fully aware that Debtors were involved in bankruptcy
> cases when they caused ACM to call the general meeting on October 24,
> 2005.

(Compl. ¶ 26, at 10.)

    **B.**    **The Individual Defendants Have Sufficient Minimum Contacts with the
United States Because Their Actions in Switzerland Had an Effect Here in
the United States and Because They Acted in New York**

     26.    This Court has exclusive custody and jurisdiction over Debtors' property,

wherever located, including Debtors' shares of ACM. See 28 U.S.C. § 1334(e)(1). This Court

also has exclusive jurisdiction to interpret and enforce the automatic stay that protects estate

property in its custody. See <u>Contractors' State License Bd. v. Dunbar (In re Dunbar)</u>, 245 F.3d

1058, 1062 (9th Cir. 2001); <u>Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United</u>

<u>Corp. Litig.)</u>, 765 F.2d 343, 347-49 (2d Cir. 1985).

     27.    "In exercising its authority in personam . . . a court may assert

extraterritorial jurisdiction over the person of the defendant, and affect rights to the defendant's

property located outside of the court's jurisdiction, if the exercise of that jurisdiction otherwise

complies with statutory requirements and Due Process requirements of the Fifth Amendment.
GMAM Investment Funds Trust I v. Globo Comunicacoes e Participacoes S.A. (In re Globo
Comunicacoes e Participacoes S.A.), 317 B.R. 235, 252 (S.D.N.Y. 2004); see also H.R. Rep. No.
95-595, at 445 (1977), reprinted in A Collier on Bankruptcy app. pt. 4(d)(i), at 4-1605 (Alan R.
Resnick & Henry J. Sommer, eds., 15th ed. rev. 2005) ("the bankruptcy court is given in
personam jurisdiction as well as in rem jurisdiction to handle everything that arises in a
bankruptcy case"); In re Schack Glass Industries Co., 20 B.R. 967, 970 (Bankr. S.D.N.Y. 1982)
(concluding that Congress created "a statutory rule designed to reflect that the totality of in
personam and in rem jurisdiction should be exercised by the bankruptcy courts in order to avoid
fragmentation of litigation and in furtherance of the spirit of economy in administration of
bankruptcy estates").  The due process test for personal jurisdiction has two components: the
"minimum contacts" and "reasonableness" requirements.  Metro. Life Ins. Co. v. Robertson-Ceco
Corp., 84 F.3d 560, 567 (2d Cir. 1996).

    28.    The individual Defendants here assert only that minimum contacts are
lacking.  The requirement of "minimum contacts" in an adversary proceeding is governed by the
long-arm provisions of Federal Rule of Bankruptcy Procedure 7004(f).  Under this Rule, the
proper exercise of personal jurisdiction focuses on the "minimum contacts" with the United
States, rather than with the forum state.  Tex. Int'l Magnetics, Inc. v. Auriga-Aurex, Inc. (In re
Magnetic Audiotape Antitrust Litig.), 334 F.3d 204, 207 (2d Cir. 2003); In re AstroPower
Liquidating Trust, 35 B.R. 309, 317 (Bankr. D. Del. 2005).

    29.    There are three types of actions by which a foreign defendant may satisfy
the minimum contacts requirement: (1) transacting business in the United States; (2) doing an act
in the United States; or (3) having an effect in the United States by an act done elsewhere.

14

Cruisephone, Inc. v. Cruise Ships Catering and Servs. N.V. (In re Cruisephone, Inc.), 278 B.R.

325, 331 (Bankr. E.D.N.Y. 2002) (citing Leasco Data Processing Equip. Corp. v. Maxwell, 468

F.2d 1326, 1340 (2d Cir. 1972)).  With respect to the third prong, personal jurisdiction may be

asserted by courts where a foreign individual, through an act performed elsewhere, causes an

effect in the United States.  See, e.g., In re Alstom SA Sec. Litig., No. 03Civ.6595(VM), 2005

U.S. Dist. LEXIS 35642, *158 (S.D.N.Y. Dec. 22, 2005) (finding prima facie case of jurisdiction

over board member based on board member's role in creation and dissemination of documents

outside United States that had effect within United States).  The conduct of each individual

Defendant satisfies the second and third tests.

            30.     The individual Defendants acted in Switzerland with the intent to cause,

and did cause, an effect here in the United States.  The individuals knew of these bankruptcy

proceedings (Compl. ¶¶ 18, 26, at 7, 10), knew that any acquisition of the estates' controlling

shares of ACM stock would require approval by this Court (Compl. ¶ 18, at 7), orchestrated the

capital increase in Switzerland to "re-acquire" and "re-gain" control of ACM from these estates

(Mot. Ex. B at 4; Compl. ¶¶ 27, 29, at 10-12), and willfully violated the automatic stay arising

out of these cases (Compl. ¶ 30, at 12).  The individuals had started negotiations to purchase the

estates' controlling interests in New York, where they obviously knew the estates'

representatives were located.  (Compl. ¶¶ 19, 26, at 7-8, 10.)  Thus, this Court has personal

jurisdiction over the individual Defendants, because their efforts to take back control of ACM

from the estates intentionally caused an effect here in the United States.

            31.     The individuals Defendants also acted in the United States, which

provides a separate and independent basis for the Court to assert personal jurisdiction.  They

initiated negotiations in New York, without disclosing that simultaneously in Switzerland they

15

were planning and attempting to take back control of ACM through the ruse of a purported

capital increase. They retained New York counsel, acknowledged that the proposed purchase

would be subject to approval by this Court, and negotiated with estate representatives here in

New York. (Compl. ¶¶ 18-19, 26, at 7-8, 10.) The individuals' intentional omission of any

mention in New York about their activities back in Switzerland caused Debtors to be unaware

that Defendants were seeking to unilaterally take back control of ACM and to exercise the

estates' subscription rights. These acts in furtherance of the automatic stay violations establish

sufficient minimum contacts. See In re AstroPower Liquidating Trust, 309 B.R. at 321 (quoting

Grand Entm't Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 483 (3d Cir. 1993) ("[Spanish

defendant's] personal, intentional communications gave rise to the underlying suit. He

voluntarily decided to negotiate with [Pennsylvania Plaintiff] and cannot now be heard to

complain about answering to a suit concerning the effect of [those] negotiations in

[Pennsylvania].").

      32.     Accordingly, the individual Defendants have sufficient minimum contacts

with the United States for this Court to exercise personal jurisdiction over each of them.

**III.    If the Court Determines that the Complaint Fails to Allege Facts Showing Minimum Contacts, the Court Should Hold the Action in Abeyance as to the Individual Defendants or, Alternatively, Permit Jurisdictional Discovery**

      33.     If the Court determines that the Complaint fails to make a prima facie

showing of personal jurisdiction, Debtors propose that the Court hold this adversary proceeding

against the individual Defendants (including non-moving defendant Sauvain) in abeyance while

Debtors pursue ACM alone. The Court previously authorized Debtors to seek to enforce the

preliminary injunction against ACM in a Swiss court. It may be that proceeding solely against

ACM will provide all of the relief necessary to protect the estates' interests in ACM. Moreover, ,

16

by proceeding against ACM alone, the estates would avoid any further expense of additional litigation against the individual Defendants.

34.    Alternatively, Debtors request permission to conduct discovery on the Court's ability to obtain personal jurisdiction over the individual Defendants.  It is well established that trial courts have the discretion to permit discovery to explore factual issues presented by a Rule 12(b)(2) motion.  <u>Gear, Inc. v. L.A. Gear California, Inc.</u>, 637 F. Supp. 1323, 1328 (S.D.N.Y. 1986); <u>Visual Sciences, Inc. v. Integrated Commc'ns Inc.</u>, 660 F.2d 56, 58 (2d Cir. 1981).  Debtors have shown that the individual Defendants began negotiations in New York and intended their actions in Switzerland to have an effect on the ACM shares that are subject to this Court's exclusive jurisdiction.  The Court should exercise its discretion to permit Debtors to conduct discovery on other possible contacts with the United States if the Court determines that the Complaint does not make a prima facie showing of personal jurisdiction.

17

### Conclusion

For all of the foregoing reasons, this Court should deny the Motion and grant such

other and further relief as this Court deems just and proper under the circumstances.

Dated:  March 16, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
J. Gregory Milmoe (JGM 0919)
McDonald Henry (SMH 0839)
Four Times Square
New York, New York 10036
(212) 735-3000

- and -

By:  */s/ Richard Levin*
Richard Levin (admitted *pro hac vice*)
Douglas B. Adler (DBA 6013)
300 South Grand Avenue
Suite 3400
Los Angeles, California 90071
(213) 687-5000

Attorneys for Debtors and Debtors in Possession